UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALYSSA L. OGDEN,

     Plaintiff,                                Case No.8:08-cv-1187-T-26TBM

v.

HILLSBOROUGH COUNTY, FLORIDA
and KEVIN WHITE, individually and
in his official capacity,

     Defendants.

_____/

**DEFENDANT KEVIN WHITE'S MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

Defendant, KEVIN WHITE, by and through his undersigned counsel and pursuant to Fed.R.Civ.P. 56, moves this Court to enter summary judgment in his favor on all claims against him.  The grounds for this motion are set forth below.

**BACKGROUND**

In Count I of the Second Amended Complaint, Alyssa Ogden (hereinafter, "Ogden"), seeks compensatory and punitive damages from Kevin White (hereinafter, "White"), in his individual capacity.[1]  Proceeding under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment, Ogden asserts that she was "subjected to intentional discrimination in the form of unwanted sexual harassment, sex discrimination and retaliation for asserting her rights that altered the terms and conditions of her employment…"[2]  Ogden was a Commissioner's Aide in County Commissioner Kevin White's office and all of her claims are

---

[1]  The remaining Counts of the Second Amended Complaint are against co-Defendant, Hillsborough County, Florida only.

[2]  Paragraph 21 of the Second Amended Complaint.

made about that employment.  White denies each and every allegation of any form of unlawful conduct toward Plaintiff.

## DISCUSSION

**I.**      **Plaintiff's retaliation claims fail both legally and factually.**

There are two elements of a claim under 42 U.S.C. § 1983.  Recovery under it requires a showing that the conduct complained of was (1) committed by a person acting under color of state law and that (2) the conduct deprived the plaintiff of a constitutional right.  Lockridge v. Board of Trustees, 294 F.3d 1010, 1071-18 (8th Cir. 2002); Gerber v. Hickman, 264 F.3d 882 (9th Cir. 2001).

Ogden's failure to deny two requests for admission destroys her claim under 42 U.S.C. § 1983.  On July 18, 2008, White served his Request for Admissions on Ogden.[3]  Ogden responded on a timely basis.  Ogden did not deny and has therefore admitted Request Number 39, which states:

> "Admit that any sexual harassment by Kevin White was in furtherance of his own interests."

Similarly, Ogden did not deny Request 40 which states:

> "Admit that any sexual harassment by Kevin White was not in the course and scope of his service as a county commissioner."

All of Ogden's claims arise out of her employment as a Commissioner's Aide in White's office.  Since it is admitted that White was not acting as County Commissioner when the conduct complained of occurred, Ogden cannot establish the mandatory element of her claim which that White acted under color of law.  Because White did not act under color of law, Count I should be

---

[3]  On May 13, 2009, Plaintiff served Amended Answers to these requests.  She has never sought relief from the Court from her admissions.  In her initial responses, she failed to address these too requests.  Rule 36(b) F.R.C.P. permits the Court to relieve her from her admissions but she has not sought relief nor have Defendants been given the opportunity to respond as to why relief should not be granted at this late stage of the proceedings and long after Plaintiff's counsel was given notice that Defendants were relying on these admissions.

dismissed in its entirety and White should be dismissed as a party in this case and awarded his costs.

**A.      If the Court does not dismiss Count I in its entirety, Ogden's claim that she was the victim of retaliation fails because a claim for retaliation is not cognizable under 42 U.S.C. § 1983 and the Equal Protection Clause.**

When the constitutional right or privilege that is to be vindicated through an action under 42 U.S.C. § 1983 action arises under the Equal Protection Clause of the Fourteenth Amendment, no claim of retaliation arises. Co-Defendant Hillsborough County ably addresses the point in its Motion for Summary Judgment (Dkt 54) at pp. 4-5 (hereinafter, "County Motion"). For the same reasons as are advanced by the County and under the authorities cited in the County's papers, the retaliation claim against White should be dismissed as well.

**B.      Ogden cannot establish the factual basis for a claim for retaliation.**

If the Court recognizes the legal existence of a claim for retaliation, the facts in the case at bar still do not support such a claim. In paragraph 1 of the Second Amended Complaint, Ogden sets forth her retaliation claim to be that she was "terminated because of her rejection of and complaints about his [White's] sexual advances." To establish a prima facie case of a retaliatory discharge, a plaintiff must show (1) participation in a protected activity known to the defendant; (2) an adverse employment action; (3) a causal connection between the activity and the action. Goldsmith v. City of Atmore, 996 F.2d 1155 (11th Cir. 1993).

"Retaliation" is grounded on having engaged in a protected activity. While Ogden's pleadings are replete with assertions of having complained, her deposition testimony is in sharp contrast. The undisputed facts establishes that White never said he wanted sex from Ogden or

said he wanted a sexual relationship with Ogden.   (Plaintiff's Deposition at p. 426).[4] Accordingly, she could not have rejected such an overture and her protection from retaliation cannot arise from any such rejection.  In addition, Ogden testified that she complained only to her sister (Plaintiff at pp. 324-325, 426). and to no one else (Plaintiff at p. 325).  At this stage, all inferences from the facts are to be drawn in Ogden's favor but the undisputed fact that she never complained to anyone but her sister destroys any possibility of an inference that a complaint to White triggered her discharge.

In her pleadings, Ogden asserts that she refused to agree (or rejected) other alleged conduct by White.  Specifically, in paragraph 13 of her Second Amended Complaint, she says she pushed White away.  "Pushing away" is not a protected activity.  See Cruz v. Coach Stores, 202 F.3d 560, 566 (2d Cir. 2000). In Cruz, the plaintiff slapped the alleged harasser, a far more physical response than alleged in the case at bar and thus more likely to draw a retaliatory reaction.  "Slapping" was not found to be protected activity in Cruz and, similarly, merely pushing the Defendant away in this case is not opposition which will found a retaliation claim. A mere rebuff, or refusal, does not rise to the level of a retaliation claim.  Even the broadest interpretation of a retaliation claim cannot encompass instances where the alleged "protected activity" consists simply of declining a harasser's sexual advances, which is all that is alleged here as Ogden seeks to show some form of "protected activity."  "If it were otherwise, every harassment claim would automatically state a retaliation claim as well." Del Castillo v. Pathmark Stores, 941 F.Supp. 437, 438-39 (S.D.N.Y. 1996)(emphasis added).  It is not enough to show that the plaintiff simply deflected invitations or advances that the recipient considered improper or offensive, which is all that Ogden supposedly did in this case.  This requirement of a complaint

---

[4]   All further citations to Plaintiff's Deposition will be "Plaintiff at ___."   The last two volumes of Plaintiff's deposition are numbered with numbers which continues from the first volume (as well as page numbers from that reporter done.)  All references will be made to the numbering which covers all four volumes.

attributing the impropriety of the conduct to a violation of the FCRA follows the language of Fla.Stat. § 760.10(7) (and § 2000e-3(a) of Title VII) which affords protection from retaliation to one who "has opposed any practice made an unlawful employment practice."

In Frank v. Harris County, 118 Fed.Appx. 799 (5th Cir. 2004), cert. denied, 544 U.S. 1062, 2006 U.S. LEXIS 4388 (2005), the plaintiff claimed she was terminated for rejecting, yet not reporting, numerous advances of her supervisor.  The plaintiff argued that the protected activity she engaged in was her "express rejection" of sexual advances.  The Fifth Circuit concluded that the plaintiff "provided no authority for the proposition that an 'express rejection' … constitutes as a matter of law a protected activity for purposes of retaliation." Id. at 904. Similarly, in LeMaire v. La. Dep't of Transp. & Dev., 480 F. 3d 383 (5th Cir. 207), the court denied the plaintiff's retaliation claim because the mere rejection of a sexual advance was not a "protected activity." Id. at 389 (citing Frank).

In its papers, Hillsborough County discusses other actions by Ogden that she may assert to be protected activity.[5]  White adopts the County's arguments and authorities as to these other claims.

Because Ogden's actions in response to alleged conduct by White are not acts of opposition, they cannot be the basis of a claim of retaliation.  Hence, Ogden's retaliation claim must fail.

### C.   Ogden cannot demonstrate that her discharge was an act of retaliation and therefore there is no "ultimate employment action."

Even if the Court determines at this stage of the proceedings that Ogden engaged in protected activity, she cannot establish that her discharge was an act of retaliation.  Ogden was terminated for reasons unrelated to any protected activity.  She was terminated because she could

---

[5] County's Motion pp. 14-15.

not do the job.  Ogden agrees that she was not doing her job and agrees therefore with the factual basis for her discharge.

Even if Ogden could establish a <u>prima</u> <u>facie</u> of retaliation, the Court should grant summary judgment in favor of White on her claims of retaliation because she cannot rebut White's legitimate, nondiscriminatory/non-retaliatory reasons for her termination. "The reason offered by an employer for an action "'does not have to be a reason that the judge or jurors would act on or approve.'"  Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory (or non-retaliatory) in nature." <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1269 (11th Cir. 1999).  As the Eleventh Circuit has held, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." <u>See</u> <u>Chapman v. AI Transport</u>, 229 F. 3d 1012, 1030 (11th Cir. 2000).

Jerry Boles, a friend of White's,  provided a recommendation of Ogden to White. Mr. Boles attended Ogden's church and also knew her because his daughter and Ogden were friends. He was responsible for putting the two together to explore Ogden's potential employment as a Commissioner Assistant.  He felt so strongly that he drove to Ogden's home and told her of the job and gave her White's cell phone number.  (Plaintiff at p. 16).

White interviewed Ogden for the job.  Ogden told White that she had two semesters of post high school education at a bible college and one semester at Hillsborough Community College.  (Plaintiff at p. 20).  She told him she was '"a hard worker" and "a fast learner." (Plaintiff at p. 21).  She also said that she was "honest," "loyal" and "intelligent" and that she

knew how to deal with people.  (Plaintiff at p. 21).  Ogden said that she could take care of situations involving people.  (Plaintiff at p. 23).  On her resume she claimed to have exceptional computer skills (Plaintiff at p. 356) and excellent communication skills.  Id.

On the same day as she was initially interviewed, Ogden met with Cedric McCray, the other Commissioner's Assistant in White's office, and she asked him about the job and what she would be doing.  Mr. McCray said that during slow times the job required answering the phone and taking messages and Ogden felt she could do that.[6]  (Plaintiff at pp. 26-27).  Ogden was given a copy of the job position for Commissioner's Aide.  She signed an acknowledgement attesting that she could do the job.  (Williams Exs. 3, 5).  She began her job in the bottom of the pay scale. (Plaintiff at 388).  In her deposition, Ogden was shown an April 5, 2007 document which has White's handwriting on it as well as her own.  (Plaintiff at 65-67).  Ogden agrees that these seven items are part of her job:

> Goals & Objectives
> 1)      Become more politically astute, on and off of the job
> 2)      Increase your name recognition as being a part of my office staff within the community.
> 3)      Think of some type of community event to become involved in.  This will get you known in the area, as well as show the community even if I can't physically be their I cared enough to send someone from my office to see what the issues were.
> 4)      Familiarize yourself with the District and its boundaries, as well as the issues in which we face.  Also try to be thinking of possible solutions.
> 5)      Look through mail and current agenda items to find possible Lot bottom issues concerning my District.  If needed.  Do some research and brief me on your findings.
> 6)      Constantly pay attention to the local news media sources to keep you & me informed of anything that concerns my District in particular, or any major issue concerning public

---

[6]  In fact, at the time she was employed at the time as a receptionist in the Kass Schuler law firm.

safety <u>police or fire</u> any where in the county.  Surrounding
counties and states really don't concern me.

7)    From time to time call Department heads to ask questions
and get updates on certain issues.

<u>BE AGGRESSIVE.</u>

<u>SHOW INITIATIVE</u>

<u>GET The Job Done.</u>

Plaintiff at 21, Ex. A.

Ogden was evaluated in a writing on September 26, 2007 prepared by White approximately six months after she began the job.  (Plaintiff at pp. 228-230).  She testified that she disagreed "somewhat" with the evaluation.  (Plaintiff at p. 229).  She said she disagreed with three statements in it.  One sentence stated, "I see absolutely no self initiative to familiarize yourself with the district boundaries or any major projects within the District the office represents."  Ogden testified that she disagreed with the statement "because I did make an effort."  Ogden disagreed with the statement "I have also seen very little growth in the area of political awareness" and with the statement "serving as an at will employee, I will continue to give you every benefit of the doubt but I can no longer settle for mediocrity with my staff."  The evaluation warned her of a staffing change in thirty to forty-five days if there was not improvement.  The basis for Ogden's disagreement with the evaluation as a whole was because she did try to do what she was supposed to do.  <u>Id</u>.

In response to the evaluation, Ogden prepared a "to-do" list of items she wanted to accomplish.  (Plaintiff at p. 341).  She testified that it was an "honest and accurate to-do list." (Plaintiff at p. 232).  She presented the list to White on October 2, 2007.  Ogden identified these items as ones that she needed to do:

1.    Know and become familiar with the boundaries of the District.

2.    Know what organizations are in the District.

8

3.      Attend some of the meetings held by different organizations to become familiar with the needs throughout the community and allow the community to get to know me.

4.      Build relationships with the Presidents and leaders of the various organizations.

5.      Drive throughout the District to see for myself what areas need attention, example drug activity, drainage issues, power lines down, neighborhood cleanup, abandoned vehicles, lighting in streets, etc.

6.      Read over the agenda before the meetings.

7.      Become familiar with all improvements that are taking place with roads, expansions in our District and throughout Tampa.

8.      Practice writing draft letters.

9.      Make it an issue to think of ways to make the District better and White's role easier.

10.     Become more politically educated.

11.     Ask questions of issues that I am not familiar with.

Thus, just a few weeks before her discharge, Ogden stated that she had to do these tasks. They are much like the things that she knew from the beginning she must do. They are the very same things that White said she was not doing and not doing well. Ogden's list, acknowledging shortcomings in her performance, establishes that work performance is the reason for her discharge.

Ogden testified that at the time she was given this evaluation, she was told by White that he had hired her with "ulterior motives." (Plaintiff at p. 98). Surely she would not have prepared an "honest and accurate to do list" after this alleged revelation unless it was, in fact, both honest and accurate. Thus, White's evaluation, which is largely concurred in by Ogden, stands as an accurate statement of her poor performance and as the foundation for a lawful termination.

As noted above, Ogden had never complained to anyone about what she alleges was occurring.  Thus, County officials who provided advice to White were objective reviewers of her performance.  White consulted with County officials about Ogden's work on three occasions.  Shortly after receiving Ogden's response to her evaluation, White talked on the phone, then met with, George Williams, the County's Human Resources Director.  Williams reviewed Ogden's performance appraisal and her response or "to-do" list.  (Williams at p. 54).  Having reviewed the performance appraisal and Ogden's to-do list, Williams and White agreed to give her time to see if she could accomplish what was on her list.  At this meeting, White gave Williams the impression that he did not want to terminate Ogden.  (Williams at p. 47).

Williams and White met again two or three weeks later.  This time Dara Chenevert joined the meeting.  She is Hillsborough County's Division Director, Organization Support, within the Human Resources Department.  The three of them discussed Ogden's performance issues.  (Williams at p. 48).  Williams advised White, "If you're having these kinds of performance issues, there needs to be a decision to let the individual go, to continue to try to develop, if you have done all of this, that you've documented you've done, and it's not to your satisfaction continuing to try to want to work with this employee is just going to be a distraction to your organization."  Id.  Nevertheless, White gave Williams the impression that he did not want to terminate Ogden.  Id.

White met with Williams and Chenevert again.  (Williams at p. 49).  Ogden was terminated on November 9, 2007.  She was told she could apply for other County jobs.  She never did so. (Plaintiff at p. 304).  During a portion of the termination meeting, Ogden met only

with Chenevert and another woman from Human Resources.[7]  (Williams at p. 66-67; Chenevert at p. 21-23, 30).  She never complained of sexual harassment to them. (Plaintiff at p.303).

Ogden's termination was the natural and predictable consequence of her poor performance.  Her agreement with the evaluation precludes a showing of pretext.  Her opinion that the evaluation was based on her alleged refusal to do what she claims White wanted her to do does not create a genuine issue of material fact.  A plaintiff's opinion that they have been discriminated (or retaliated) against does not even suffice to create a prima facie case of discrimination.  See McMillian v. Svetanoff, 878 F.2d 176, 190 (7th Cir. 1989)(plaintiff's subjective belief that defendant was racially biased is insufficient to create a genuine issue of material fact to overcome a motion for summary judgment).  Accordingly, the Court should find that Ogden has failed to offer any evidence sufficient to demonstrate pretext in White's legitimate, non-discriminatory reasons for the termination of her employment.  Because Ogden cannot rebut White's legitimate, nondiscriminatory reason for the termination of her employment, all of her claims retaliation must fail.[8]

## II.    Ogden's sexual harassment claim based on a hostile work environment fails because it is based on allegations of conduct which are neither severe nor pervasive.

The Eleventh Circuit has recognized that Title VII's hostile environment theory is applicable to 42 U.S.C. § 1983 cases under the Equal Protection clause.  Watkins v. Bowden, 105 F.3d 1344 (11th Cir. 1997).  White will analyze Ogden's claim under Title VII cases in this motion.

---

[7]  White began the meeting and then exited it.

[8]  As the Eleventh Circuit has repeatedly and emphatically held, an employer "may terminate an employee for a good or bad reason without violating federal law."  Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir.1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").  Courts are "not in the business of adjudging whether employment decisions are prudent or fair. Instead, [the courts'] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Id. at 1363.

In order to establish a prima facie case of a hostile environment/sexual harassment claim, Ogden must be able to prove that: (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer knew or should have known about the harassment and took insufficient remedial action.  Henson v. Dundee, 682 F.2d 897 (11th Cir. 1982).[9]

In examining Ogden's evidence of a sexually hostile work environment, her deposition testimony is that White did not say he wanted sex or for her to enter into a sexual relationship. (Plaintiff at pp. 426-27).  An examination of Ogden's evidence shows much of her complaint to be about non-sexual conduct.

For conduct to be actionable, an employee must perceive the conduct to be severe and pervasive and it must be objectively so as well.   The conduct must be judged from the perspective of a reasonable person in the Plaintiff's position, considering all the circumstances. City of Boca Raton v. Faragher, 524 U.S. 775, 787.  The objective component of this analysis is fact intensive.   The Court must consider four factors in determining whether the conduct objectively altered Ogden's terms or conditions of employment: (1) frequency of conduct, (2) severity of conduct, (3) whether the conduct unreasonably interferes with the employee's job performance, and (4) whether the conduct of physical threatening, humiliating or a mere offensive utterance.  Mendoza v. Borden, 195. F.3d 1238, 1245 (11th Cir. 1999).  These factors will be discussed below.

---

[9]  Under the facts of this case, the last prong of the test is inapplicable.

Ogden was asked about how often something she deemed to be offensive occurred:

> Q    Did Commissioner White, in your opinion, sexually harass you on a daily basis?
>
> A    I wouldn't say daily basis, but it was definitely not one week went by that he didn't say something along the line of me being in a relationship with him, giving him a chance, along those lines.
>
> Q    And this is documented where?
>
> A    I don't have any documentations of him have – doing that on a daily basis or biweekly basis.
>
> Q    So if I were to show you a calendar and ask you, tell me looking at the calendar on which dates Commissioner White, in your opinion, sexually harassed you, you wouldn't be able to do that, would you?
>
> A    Not a daily basis.
>
> Q    No?
>
> A    There's certain events that took place, certain dates that I can recall, but as for me being able to point out daily that he sexually harassed me, no, I would not be able to point out the days.
>
> Q    Okay.  Let's get away from the daily and let's go to the weekly.  If I were to show you a calendar would you be able to tell me weekly on which dates he sexually harassed you?
>
> A    No, ma'am.
>
> Q    Would you be able to tell me where you were located and where he was located when he sexually harassed you?
>
> A    It most likely always took place in the office or events, football games, hockey games, things of that nature.
>
> Q    Would you be able to give me dates?
>
> A    Of a few of the events that I remember, yes, I possibly could.

Plaintiff at 364-366.

The Supreme Court and the Eleventh Circuit has held that the workplace must be permeated with conduct which is objectively harassing in order for a claim to survive.  See Harris v. Forklift Systems, 510 U.S. 11, 21-22.  In Miller v. Kenworth of Dothan, Inc., 277 F.3d

1269(2000), the Eleventh Circuit found conduct which occurred three to four times daily to be sufficiently frequent.  In <u>Dees v. Johnson Controls Worldwide Service, Inc.</u>, 168 F.3d 417 (1999), the Eleventh Circuit held that sexual harassment had occurred where the plaintiff had experienced "almost daily" abuse including jokes, references to her body and physical harassment.  Judge Bucklew recently granted summary judgment to the defendant in <u>Lockett v. Choice Hotels International, Inc.</u>, 2008 U.S. District LEXIS 50927 (2008), in a case where the plaintiff experienced four months' (less three weeks when she did not go to the work area) of **daily** conduct consisting of sexual remarks every day, a hug, a touch of her buttocks and two or three tongue gestures.  The Eleventh Circuit, in affirming Judge Bucklew, found the conduct to be insufficiently frequent to meet the plaintiff's burden in establishing sexual harassment. <u>Lockett v. Choice Hotels International, Inc.</u>, 2009 U.S. App. LEXIS 3944 (2009).

In the case at bar, Ogden claims that the conduct was weekly, which is far less severe in both the intensity of the conduct and the number of experiences than the case law requires. Ogden complains about being touched once on the waist during an attempt to kiss her and a second time on an area on her buttocks over the course of the seven months she worked as a Commissioner's Aide.  The balance of her complaints are about verbal expressions, none of which are the sex specific language which is more offensive to one gender than the other.  Every alleged comment is unwitnessed as are all the acts of which Ogden complains.[10]  White's conduct, as alleged by Ogden, is not sufficiently frequent to raise a genuine issue of material fact.

In determining whether the conduct attributed to White interfered with Ogden's work environment, it is appropriate to note several critical facts from Ogden's testimony.  Despite

---

[10]   Plaintiff identified several witnesses.  None of them agree with her except her sister, whose testimony is discussed below (and mostly hearsay), and her mother, whose knowledge is all based on hearsay.

everything she pleads happened, she did nothing reasonably calculated to improve her work environment, suggesting it was far from intolerable or that she felt it even interfered with her work.  Hillsborough County has demonstrated in its papers that Ogden never complained about her work environment and that she knew how to do so.[11]  White adopts the arguments advanced by the County and the authorities cited by it.

White is not suggesting that he is entitled to the Ellereth/Faragher defense.  White does suggest that Ogden's familiarity with the County officials and the County's sexual harassment complaint procedure and Ogden's failure to do anything suggests that her work life was not sufficiently interfered with to motivate her to speak with the officials or to follow the County sexual harassment complaint procedure.  Ogden knew Renee Lee, the Hillsborough County Attorney and met her weekly when she was briefing Commissioner White (Plaintiff at 316).  If White was away, Lee briefed Ogden and the other Aide.  She knew the County Administrator, Pat Bean, who greeted Ogden by name when they saw each other.  (Plaintiff at 62).  She never complained to them.  Twice during her employment, in April 2007 and again in September 2007, all County employees were offered training seminars on sexual harassment.[12]  (Williams at 70-71, County Ex. C).  In addition, all training programs are posted on the County's computer system which Ogden used.  She never chose to attend a seminar on sexual harassment.  (Plaintiff at p. 302).  Finally, in addition to not utilizing the sexual harassment complaint procedure and not attending the offered training program, Ogden did no more to look for a job while employed there than to look at the classifieds "on occasion."  (Plaintiff at pp. 196).  If the conditions are

---

[11]  County Motion at pp. 16-19.

[12]  As will be discussed below, Plaintiff claims White came to her hotel room on the early morning hours of April 6, 2007 and that she perceived that he was seeking sex.  If that is truthful, why did she not attend the April training session to which she was invited.

intolerable or interfering with your work, you must do something to help yourself when the tools to do so are in your hands.

The first event of which Ogden complains arises in Atlanta, Georgia. While the hiring process was ongoing White had introduced Ogden to C. Blythe Andrews, Jr., who is the publisher of the Florida Sentinel Bulletin. Mr. Andrews and White rode in Mr. Andrew's Mercedes when White brought a packet of hiring documents to Ogden at the Kass Schuler law firm where she was employed. (Plaintiff at pp. 30, 34, 39). She met them in the parking lot. White gave her the packet to review and sign and Mr. Andrews gave her his business card. (Plaintiff at p. 32).

She does not remember how many times she talked to Mr. Andrews on the telephone or in person during the period from when they met in the parking lot until she actually began her job. (Plaintiff at p. 34). On the very first day of her employment, Mr. Andrews took Ogden, along with White and Mr. McCray, to the Capital Grille, an expensive Tampa restaurant, for lunch. (Plaintiff at p. 34, 81).

In advance of the Atlanta trip, White told Ogden that she would have a plane ticket for which she did not need to pay and that he would be staying at a friend's home in Atlanta.[13] (Plaintiff at p. 112). Ogden and White met Mr. Andrews, Mr. Andre White (White's uncle), and a female companion of Mr. Andre White's, and they went to lunch. (Plaintiff at p. 118). Mr. Andrews, Andre White and White had a business meeting with some men that lived in Atlanta where they went to eat lunch. (Plaintiff at pp. 84-85). Thereafter, all of them except Andre White went to Lennox Mall. Ogden did not ride with White, who had a car. (Plaintiff at p. 120). She rode with Mr. Andrews. At the Mall, White left the group and shopped on his own.

---

[13]  The parties disagree on the purpose of the trip. Ogden says it was for her to meet prominent people and part of her job. White testifies that she negotiated for the day off as part of the hiring process and that she asked him to go and he agreed.

(Plaintiff at p. 120).  At the Mall, Mr. Andrews bought Ogden some clothing at BeBe.  (Plaintiff at pp. 121-125).  Some of the clothing was appropriate for work and the rest of the clothes were for casual wear.  Id.

White rejoined the group and they went to Chops Steakhouse and Lobster Bar for dinner, where Andre White rejoined the group.  (Plaintiff at p. 136).  Mr. Andrews paid for that dinner.  (Plaintiff at p. 136).  White left the group as dinner was ending and went out in Atlanta on his own.  (Plaintiff at p. 138).  Ogden, Mr. Andre White (and his companion) and Mr. Andrews went to the Marriot hotel where Ogden and Mr. Andrews were to spend the night.  (Plaintiff at p. 137).  Ogden did not register herself but was given a room key.  She is not sure who gave her the key except she knows it was not Kevin White.  (Plaintiff at p. 138).  At some point when she and Mr. Andrews were at the Marriot hotel, Mr. Andrews told her he wanted a companion which Ogden interpreted to mean a sexual companion, specifically, a "sex toy."  (Plaintiff at pp. 202-204).[14]

Ogden went to bed at the Atlanta Marriott.  She customarily wears pants and a shirt to bed but does not remember what she packed to wear in Atlanta.  (Plaintiff at p. 148).  Ogden asserts that White, rather than staying with a friend as he had told her he would do, called her on her cell phone from outside her room at the Marriott.  (Plaintiff at pp. 155-157).  She claims White said he was having trouble finding a place to stay.  She let him into her room.  (Plaintiff at pp. 165-168).  White did not try to kiss her or touch her when entering the room.  (Plaintiff at p. 168).  He showered and entered the darkened sleeping area. (Plaintiff at p. 169).  According to Ogden, White then asked her if she was awake.  She chose to say that she was.  (Plaintiff at p. 176).  He asked if she minded if he slept with her (Plaintiff at p. 177). He promised he would not touch her.  (Plaintiff at p. 178).  She said "no" and he did not persist.  Id.  He did not make any

---

[14]  It has been suggested that White is throwing Mr. Andrews "under the bus."  It was Plaintiff who first interjected him into the litigation when she named him as one of her witnesses in answering interrogatories and when she swore than that Mr. Andrews told her when the two were in Atlanta that he wanted a companion.

comments or requests linking, or suggesting a link, between her actions and her career.  (Plaintiff at p. 179).  There was no further interaction between Ogden and White while in Atlanta except a group breakfast and an uneventful ride home.[15]   Mr. Andrews and Ogden continued their relationship.[16]  Ogden made these contemporaneous notes about the Atlanta trip: "Left for ATL," "Met James Brown's son-in-law," "shopped," "Dinner at Chops." (White Exhibit B).  Where is any contemporaneous note about anything more important to Ogden than "shopping" and "dinner"?  If the Atlanta room event occurred, it apparently had less impact on Ogden than "shopping" and "dinner", and meeting James Brown's son-in-law.

Ogden can claim but two instances of being touched.  One was having White's arm around her waist as he allegedly attempted to kiss her.  (Plaintiff at pp. 210-211).  There is no claim that any other parts of their bodies touched.  While Ogden claims that there were at most two other attempts to kiss her, there was no touching in either of these instances.[17]  (Plaintiff at p. 218).  The second alleged touching was in the context of a group photo at a Lightning game.  She claims White touched her on her buttocks.[18]   The game was at the St. Pete Times Forum and "there were a lot of people there."  (Plaintiff at p. 214).  At least three people, Ogden, White and the second Commissioner Aide Cedric McCray were in the picture.  Ogden cannot remember the

---

[15]  Ogden asserts that she lay awake all night with her face toward White.  (Plaintiff at p. 172).  She did not take a picture of him with the camera in her cell phone which she had with her.  She does not remember when he left. (Plaintiff at p. 172).  She does not remember what, if anything, White said when he left. (Plaintiff at p. 188).  She does not remember what he wore when she let him in the room or when he left or whether he snored.  Ogden, White and Mr. Andrews returned to Tampa in Mr. Andrews' motor home.  Ogden wore one of the outfits Mr. Andrews had bought for her on the ride to Tampa.  (Plaintiff at p. 180).

[16]  Ogden had lunch Donatello's restaurant with White and Mr. Andrews the next business day after the trip. (Plaintiff at p. 90).  From Ogden's phone records, we knew that Ogden and Mr. Andrews continued to talk on the cell phone. They talked by cell phone on several occasions during her employment as a Commissioner Assistant. Ogden claims she does not remember what they talked about.  Mr. Andrews took Ogden, White and Cedric McCray to lunch several times during Ogden's employment.  Mr. Andrews always paid for lunch.

[17]  When asked how many times she claims White tried to kiss her, Ogden said "two or three." (Plaintiff at 205). She kept two diaries and noted some events in this case in them but none of the contemporaneous entries are about the kiss or any other act she claims to be sexual harassment.  See e.g., (Plaintiff at p. 205).

[18]  She testified that it was on the "outer aspect" of her buttocks and not near her genitalia area.  (Plaintiff at 496).

order that the three of them stood in for the picture nor which hand was used by the person who allegedly touched her.  She has no more basis for claiming that White touched her than the other Aide except that she concludes that the other Aide would not do that.  (Plaintiff at p. 214).

The Eleventh Circuit Court of Appeals opinion in <u>Gupta v. Florida Board of Regents</u>, 212 F.3d 571 (2000), is instructive on "touching."  The plaintiff's sexual harassment claim was based on a supervisor's "looking me up and down" which made her feel "uncomfortable," attempt to go to her home to bring food, calling her at home late in the evenings asking about her boyfriend, being upset when she had lunch with others, putting his hand on the inside of her right thigh, lifting her skirt hem four inches and "unbuckling the inside of his belt, pulling down his zipper and touching his shirt in front of her.  The supervisor also called her and offered to spend the night with her which she interpreted to mean that he wanted sex with her.  These events occurred over six or seven months.  <u>Gupta</u> at 576-579.  Commenting that while Gupta's supervisor should not have done some of those things, the Eleventh Circuit held that collectively they did not establish severe and pervasive conduct but rather that it exemplified "the ordinary tribulations of the workplace," quoting <u>City of Boca Raton v. Faragher</u>, 524 U.S. 775, 788.

The Court in <u>Gupta</u> cited with approval a Seventh Circuit decision, <u>Minor v. Ivy Tech State College</u>, 174 F.3d 855 (1999).  <u>Minor</u> involved a supervisor who "put his arms around the plaintiff, kissed her, squeezed her and said, 'now, is this sexual harassment?'"  The <u>Minor</u> court held that no hostile work environment was created even with the actual kiss and hug, which is far more physically threatening than Ogden claims to have experienced.

In the case at bar, White's alleged touching of Ogden does not reach the level found in <u>Minor</u> and <u>Gupta</u>.  Minor was hugged and squeezed; Ogden makes no similar allegation.  Gupta's skirt hem was lifted; Ogden makes no similar allegation.  White never unzipped his

pants in front of Ogden and he never had full body contact with her as in <u>Minor</u>.  Thus, this Court should not lower the bar by finding White's alleged physical conduct sufficient to survive summary judgment.  As in <u>Gupta,</u> what White is alleged to have done does not constitute sexual harassment.  <u>See</u> <u>Mendoza v. Borden</u>, 195 F. 3d 1238 at 1252 n.10.

In an affidavit, Ogden complains that "White made it obvious he was staring at me inappropriately, I felt violated from his stares" and "[h]e consistently called me in his office to get him something to drink.  By the time I brought him the drink he asked for; [sic] he would change his mind and ask me to bring him something else, only to have me walk in front of him again.  I felt incredibly uncomfortable because he was taking advantage of the fact that I was his employee."

Ogden concedes that she and the other Commissioner's Aide, a male, were both asked by email to bring drinks so the complaint can only be about White's staring at her.  (Plaintiff at 480).  The Eleventh Circuit in <u>Gupta</u>[19] quoted approvingly the language from Justice Carnes' concurring opinion in the Court's <u>en</u> <u>banc</u> <u>Mendoza</u> decision.  The <u>Gupta</u> court held that we cannot mandate that "an employer [] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her."  <u>Mendoza</u>, 195 F.3d 1238, 1256.  Ogden cannot rely on alleged "staring" as a part of her sexual harassment claim.

All of the other conduct to which Ogden takes issue is of a verbal nature.  None of it is the "sex specific" language such as references to female genitalia as has been found to be a part of a hostile work environment.  <u>See</u> <u>e.g.,</u> <u>Reeves v. CH Robinson Worldwide</u>, 525 F. 3d 1139 (11th Cir. 2008).  In <u>Reeves</u>, the plaintiff testified that from summer 2001 to the spring of 2004

---

[19]  Ogden seems to be as concerned about her place in the hierarchical structure of the office as she was about what White is supposed to have done with his eyes.  Neither being asked to bring a drink or staring in a way Ogden did not like until after she was terminated is actionable.

"every day of the year" she heard from one employer or another, offensive language, phrases, jokes, songs, comments and remarks including "fucking bitch," "fucking whore," (referring to others not the plaintiff), a joke punch line "fuck, your sister and your mother is a whore," a reference to "getting off," a reference to a woman's teeth on a man's "dick," "cunt," and comments about the size of women's bottoms.  The court reversed a grant of summary judgment because of the daily frequency and the humiliating nature of some of the expressions.  Ogden cannot point to any similar language in her allegations against White.  The closest she can come is to a single reference when she claims White said he could be a "dick," which was not a reference to genitalia but instead, a reference to the type of person White could allegedly be.

Ogden claims that White asked her to go on trips with him.  (Plaintiff at p. 371).  She does not say, with the exception of the Atlanta trip, that his other Aide was excluded from the invitation to go on trips.  She made no note of these events, although she kept a diary.  The only trip she can identify was to the Congressional Black Caucus.  Id.  Ogden admits there is no evidence that White ever asked her to go out of town.  (Plaintiff at p. 372).

This verbal conduct by White, if it occurred, is not sexual harassment.  The Congressional Black Caucus is a national event -- clearly an appropriate business trip for White.  We have no evidence about the other alleged trips other than Ogden's assertions that she was asked to go; regardless, there is no evidence that the invitations were sex based because there is no evidence that the other aide, a male, was not asked.

Ogden asserts that White called his other aide and her while he was in Orlando.  Ogden and the other aide were on the speakerphone in the County Commissioner's suite at the County

Center.[20]  Ogden claims White and a female companion "talked about something like – I don't know, something sexual though." (Plaintiff at p. 235).  Her testimony continues "… he never said sex or anything like that, but he said something along the lines of, oh, we just had a hell of a time, or something like that …," from which her "impression" was that the "good time" meant intercourse.  (Plaintiff at p. 236).  White was in Orlando, the entertainment capital of this tourist state.  It was not objectively reasonable for Ogden to conclude, in the absence of at least some clue that the quoted reference was to sexual activity, that White's saying he had a "good time" was sexual in nature, let alone how this alleged telephonic statement created a hostile work environment.

Ogden asserts that White asked for a kiss, raised his finger and told her "be clairvoyant," asked to be "given a chance" (Plaintiff at p. 225), said that she "was too young to see a good thing" and that others would do anything to be where she was."  She also says that he commented falsely about her underwear and her breasts.  For whatever probative value raising a finger and saying be clairvoyant has, Ogden did not know those gestures and expressions were sexual harassment until very late in her employment when she claims she learned that they were. (Plaintiff at pp. 531-533).  Ogden testified that her sister heard a comment about her breasts. (Plaintiff at p. 503).

Ogden's sister was deposed and asked about her recollection of times she was with her sister and White.  She could testify about three lunches and said she could not remember the details of any other lunches.  (Krystal Ogden at p. 19).  She complained about White's alleged staring at each lunch, at being asked herself "what are you going to do for me?" and a comment

---

[20]  Ogden testified that you could hear what went on in other offices.  (Plaintiff at p. 108).  One presumes these other offices can hear what goes on in White's.  Since White is speaking to both of his aides, he would have known he was talking to a speakerphone.  Certainly, White would not speak about a sexual activity to not only his aides but also to adjacent offices as well.

that she attributed to White "I heard we were going to the Renaissance Hotel."  (Krystal Ogden at 6).  She cannot recall what he did with his face that made the stare demeaning or sexual and she cannot recall any gesture with his mouth during any stare.  (Krystal Ogden at 9).  When pressed, Krystal Ogden admitted the alleged comment about her sister's breasts was made when she was away from the table. (Krystal Ogden at pp. 10).

Taking every unwitnessed and unrecorded utterance into account, Ogden cannot demonstrate the required level of severity and pervasiveness that she must to establish that there is a genuine issue of material fact.

In Mendoza v. Borden, 195 F.3d 1238 (1999), the court explained Mendoza's allegations. Mendoza complained about consistent watching, consistent following her around, two instances where the supervisor stopped and stared at her groin area and made a sniffing noise and another sniffing noise and the comment "I am getting fired up."  She complained that the supervisor rubbed his hip against hers while touching her shoulders and that when she said to him that she come to work "only to work" that he said, "yeah, I'm getting fired too."  The Mendoza en banc opinion collects cases from other circuits and concludes that what Mendoza claimed was not severe nor sufficiently frequent.  The court noted that other courts had rejected claims based on conduct such as "your elbows are the same color as you nipples, deliberate touching of the plaintiff's breasts, attempting to look down the plaintiff's dress, a reference to "you got to get when you can," positioning a magnifying glass over the plaintiff's crotch, suggesting that a woman's breast area be renamed "Twin Peaks" and an act simulating masturbation.  Mendoza at 1246-48.

In the case at bar, comments such as "be clairvoyant" and "give me a chance" are not only ambiguous and of a nonsexual nature but surely fall short of the bar set in Mendoza.  Her

complaint about being asked to go on trips is not gender based.  What touching Ogden claims to have occurred does not reach the level in <u>Gupta</u> and <u>Minor</u>.  Both of those cases rejected the plaintiff's claim of sexual harassment.  A claim similar to Ogden's claim of being "stared at" was rejected in <u>Mendoza</u>.  Whatever happened is not sufficiently frequent to be actionable.  It falls far short of the Eleventh Circuit's decision in <u>Lockett</u> which rejected approximately four months of daily harassment.  Ogden fails to establish that there is a genuine dispute of material fact.  Because she cannot show that what she claims White did is severe and pervasive, her sexual harassment claim must fail.  White is entitled to summary judgment.

Respectfully submitted,

/s/ Steven G. Wenzel
**STEVEN G. WENZEL**
Florida Bar Number: 159055
Wenzel Fenton Cabassa, P.A.
1110 N. Florida Avenue, Suite 300
Tampa, FL 33602
(813) 224-0431 Telephone
(813) 229-8712 Facsimile
swenzel@wenzelfenton.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of May, 2009, the foregoing was electronically filed using the CM/ECF system which will send notice of the electronic filing to:

Ronald W. Fraley
The Fraley Law Firm, P.A.
2525 Park City Way
Tampa, Florida 33609
rfraley@fraleylawfirm.com
Attorney for Plaintiff

Claire Saady, Esquire
Saady & Saxe, P.A.
205 Crystal Grove Blvd.
Lutz, Florida 33548
saadyandsaxe@saadyandsaxe.com
Attorney for Defendant Hillsborough County

/s/ Steven G. Wenzel
<strong>STEVEN G. WENZEL, ESQUIRE</strong>